IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RUFUS BLAINE FREEMONT, | |
| Petitioner, | **8:18CV200** |
| vs. | |
| SCOTT R. FRAKES, | **MEMORANDUM AND ORDER** |
| Respondent. | |

This matter is before the court on Petitioner Rufus Blaine Freemont's ("Petitioner" or "Freemont") Petition for Writ of Habeas Corpus. (Filing No. 1.) For the reasons that follow, Petitioner's habeas petition is denied and dismissed with prejudice.

## I. CLAIMS

Summarized and condensed, and as set forth in the court's initial review order (filing no. 4), Petitioner asserted the following claims that were potentially cognizable in this court:

Claim One:     Petitioner was denied effective assistance of counsel *because* trial counsel (1) failed to elicit evidence and testimony from witnesses to support theory that a third party fired the shots; (2) failed to object to inadmissible identification evidence; (3) failed to request cautionary jury instruction regarding accomplice testimony; (4) failed to object to and ask for mistrial based on State's closing argument regarding Petitioner's "consciousness of guilt"; (5) failed to request continuance or create a deposition outside the presence of the jury when the State provided an untimely ballistics report; (6)

failed to adduce significant forensic evidence regarding bullet trajectory; (7) failed to elicit evidence on Petitioner's lack of motive; (8) failed to object to testimony by Martin regarding post-*Miranda* statements of Samantha Vawter that were not made available in pretrial discovery; and (9) failed to make Petitioner aware of his speedy trial rights.

Claim Two:    Petitioner was denied effective assistance of counsel because trial and appellate counsel failed to argue for a sudden quarrel jury instruction when all the evidence supported a manslaughter conviction.

Claim Three:  Failure to include a sudden quarrel jury instruction amounts to a violation of Petitioner's right to Due Process under the Fourteenth Amendment.

(Filing No. 4 at CM/ECF pp. 1-2.)

## II.  BACKGROUND

### A.  Conviction and Sentence

The court states the facts as they were recited by the Nebraska Supreme Court in *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012). (Filing No. 11-2.) *See Bucklew v. Luebbers*, 436 F.3d 1010, 1013 (8th Cir. 2006) (utilizing state court's recitation of facts on review of federal habeas petition).

Freemont was charged with second degree murder in connection with the killing of Andrew Galligo on June 18, 2010.[1] The following evidence was adduced at trial.

---

[1] Freemont was also charged with use of a deadly weapon to commit a felony and possession of a deadly weapon by a prohibited person. (Filing No. 11-3 at CM/ECF p. 35.)

Police responded to a report of a shooting on 24th and Vinton Streets in Omaha, Nebraska. Sgt. Matthew Rech observed Galligo lying on the ground, surrounded by four individuals. Galligo had been shot in the chest and died as a result of the injury.

Several bystander witnesses, who were either at the scene or nearby at the time of the shooting, testified at trial. Each witness testified that prior to the shooting, Galligo had been engaged in a confrontation with a woman, later identified as Claudette Loera, in a parking lot.

According to witnesses, prior to the shooting, Loera was driving a white Chevrolet Cobalt, which was later identified as belonging to Samantha Vawter. Loera's sister, Christa Harlan, was seated in the passenger seat, and Vawter and Freemont were seated in the back seat. According to Harlan and Vawter, as the vehicle approached 24th and Vinton Streets, the passengers saw Galligo walking down 24th Street. Galligo was wearing red and black, colors which are associated with a gang to which Loera belonged. Loera turned the car around and yelled at Galligo, asking about his gang affiliation. Loera "flipped" a gang sign at Galligo by making a gesture with her hand. Galligo was a member of a different gang, and "threw up" a gang sign at Loera in response. Loera then pulled the vehicle into a nearby parking lot, exited the vehicle, and confronted Galligo.

Loera and Galligo had a verbal confrontation, during which Harlan exited the vehicle and told Loera to leave Galligo alone and get back in the vehicle. Loera spit on Galligo and moved to return to the vehicle. Galligo asked Loera if she was getting a gun, and attempted to walk away from the vehicle. Loera followed Galligo, at which time four or five gunshots were fired from the vehicle and Galligo was struck in the chest.

Following the shooting, Loera immediately returned to the vehicle and drove from the scene. Freemont was let out at 17th and Ontario Streets. Loera then drove to an alley where she, Vawter, and Harlan changed their clothes to avoid being

identified. Loera attempted to hide the vehicle behind an abandoned house, and then she walked with the others to the house of a friend named "Melissa."

## 1. Witness Testimony

At trial, a witness testified that she and her sister were shopping at a strip mall near 24th and Vinton Streets at the time of the shooting. As they were leaving a nearby store, the witness saw a white car, which was parked in front of the exit to the parking lot. The witness entered her car and waited for the white car to move so she could exit. She testified that she saw Loera and Galligo arguing and observed a man in the back seat of the white car place his hand, holding a gun, out of the window and shoot Galligo. The witness' sister also testified that she saw the argument between Loera and Galligo and witnessed shots being fired from the back seat of the white car, but she did not see who fired the gun.

Another witness who was also in the parking lot at the time of the shooting testified that he observed an altercation taking place in front of a white Chevrolet Cobalt and that he heard gunfire, though he did not see who fired the shots.

An individual who was also present in the parking lot witnessed the altercation in front of a white vehicle. He testified that he witnessed a person, whom he identified as a passenger of the vehicle, attempting to break up the fight between the driver of the vehicle and another person. He stated that the person who shot Galligo was seated in the back seat of the vehicle. He testified that he had observed three persons in the vehicle at the time of the shooting—the driver, front passenger, and the rear passenger—and that he did not see the gun that fired the shots.

Another witness testified that she was in the area of 24th and Vinton Streets at the time of the shooting and that she observed two people dressed in red engaged in an argument. She heard the gunfire that followed, and the windshield of her car was struck with a bullet. She was unaware of who fired the shots.

Another witness also testified that he was in the area at the time of the shooting. He was previously acquainted with Loera and Galligo and heard them arguing in the parking lot. He heard the gunshots, but could not identify who fired the shots.

Harlan and Vawter testified. Harlan is Loera's sister, and she had been living with Melissa at the time of the shooting. Harlan testified that she knew Freemont and was acquainted with Vawter. Loera had contacted Vawter for a ride earlier that day to go to Westroads Mall and "get some weed." Loera was driving Vawter's car, and on the way home, Harlan and Loera stopped to pick up Freemont. Harlan testified that Vawter and Freemont had a child together, but that she was not well acquainted with Vawter. Freemont was carrying a backpack when they picked him up earlier that day. After picking up Freemont, Loera was driving, Harlan was seated in the front passenger seat, Vawter was in the back seat behind the driver, and Freemont was in the back passenger seat. They saw Galligo walking when they stopped at a light.

Harlan recounted the argument that followed and testified that she got out of the car and told Loera to leave Galligo alone, that he was their cousin, and to get back into the car. Loera started back to the car, and Harlan told Galligo to keep walking, when Loera turned around as if to follow Galligo. Loera then turned to Harlan and returned to the car. As Harlan was getting into the car, she heard gunshots and was startled because neither Loera nor Galligo had a weapon. Harlan testified that the shots came from the back seat of the car and that Freemont had fired the gun. She did not observe what kind of gun it was. Harlan observed Freemont holding the gun toward the car window. Loera returned to the car and drove Harlan, Vawter, and Freemont from the scene.

The State asked Harlan if she had witnessed Freemont carrying a gun "a few days before" the incident. Freemont objected to this question, and an off-the-record discussion was held at the bench, after which the objection was overruled. Harlan answered that she had seen Freemont a few days earlier with a gun. Harlan stated

that at the time, Freemont was carrying the gun in a backpack that looked the same as the one he was carrying on the day of the shooting.

The day after the incident, Harlan was questioned by police, at which time she gave the officers a fake name. Police showed Harlan a photographic array, and she identified a person other than Freemont as the shooter. Harlan said she had lied because she knew she had outstanding warrants and because she was scared. Loera had apparently threatened Harlan and Vawter, telling Harlan that if she was going to "cry," Loera would have to kill her.

Loera was arrested the day after the incident in connection with Galligo's death. Harlan spoke to Loera after she was arrested, and Harlan told Loera that she had purposely named the wrong person as Galligo's shooter. Police confronted Harlan with this conversation, showed her the same photographic array, and asked her again to identify the shooter. Harlan identified Freemont as the shooter at that time.

Vawter testified that she was seated in the back seat of the car at the time of the shooting. She stated she knew neither Loera nor Galligo possessed a weapon because both had lifted their shirts to show that they did not. Vawter said that Freemont told Loera to get back into the car while the two were arguing. After Harlan got out of the car, Freemont reached into his backpack and pulled out a gun. He told Vawter to "sit back," and leaned across her and shot four rounds out the window at Galligo. Freemont then put the gun back into his backpack.

Vawter went to Melissa's house with Harlan and Loera. Loera threatened Vawter, told her she would probably be charged because the car was in her name, and told her she should not say anything. Vawter left the house and returned to her home. That night, Loera texted her and told her to get new license plates and hubcaps for the car. The next day, Vawter returned to Melissa's house, where Loera told Vawter to "go dump the car" because the license plate number was all over the news.

Vawter left the house and called the police, informing them that she had information about the murder.

Vawter met with the police and told them that Freemont was the shooter. Vawter changed her story a number of times in speaking to the police, but consistently maintained that Freemont had fired the shots. Vawter testified that she had lied because she was afraid of Loera.

Loera was charged with being an accessory to a felony as a result of her involvement in the incident. Loera testified at Freemont's trial and stated that she had not made a deal with the prosecutor in exchange for her testimony. Loera testified to the events leading up to the altercation with Galligo and identified Freemont as the shooter. Loera stated that she was yelling at Galligo when she heard gunshots. When she looked behind her, she saw Freemont holding a gun out of the car window.

The State asked Loera if she had seen Freemont carry a gun prior to the day of the shooting. Freemont again objected to this line of questioning on the grounds of relevance and Neb. Evid. R. 403 and 404, Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404 (Cum. Supp. 2010). The objection was overruled, and Loera answered that Freemont had gotten into an altercation with one of her cousins a week before the shooting, during which he displayed a gun. Loera testified that Freemont kept the gun in his backpack and that it was a .22-caliber revolver.

When the Omaha Police Department discovered Freemont's whereabouts, the fugitive unit was directed to the address to arrest Freemont. Investigator Dan Martin was involved in the arrest of Freemont. Martin testified that the fugitive unit entered the building identified as Freemont's location and that Martin heard a window break and saw someone attempting to crawl out of a second-story window. The State offered exhibit 74, which shows the building and the window out of which Freemont leapt. Freemont objected to the admission of the exhibit on the bases of relevance and §§ 27-403 and 27-404; the objection was overruled. Exhibit 73 shows the same

window from a different perspective; it was also admitted into evidence. Freemont fell to the ground and was immediately tasered and arrested. Following the arrest, the officers recovered a black backpack. A gun was not recovered at any time in the investigation.

The pathologist who performed the autopsy of Galligo testified at trial. During his testimony, the State offered exhibits 56 through 58, showing the injuries Galligo suffered to his face. Freemont objected to these exhibits on the basis that they were overly prejudicial under § 27-403; the objection was overruled. The State also offered exhibit 63, showing the "exit" site of a bullet which was removed from Galligo's back. Freemont again objected on the basis of § 27-403; the objection was overruled.

Daniel Bredow, a senior crime laboratory technician and firearm and toolmark examiner employed by the Omaha Police Department, was called to testify for the State. Bredow testified regarding a bullet that had been removed from Galligo's body, marked as exhibit 41. Bredow stated that the bullet was a ".22 rimfire caliber" that was consistent with one of "96 different models" of .22-caliber weapons, including handguns, rifles, revolvers, and semiautomatics. However, Bredow ultimately testified that it was not possible to specifically determine what weapon fired the bullet marked as exhibit 41.

Freemont objected to the entirety of Bredow's testimony, and the court held a hearing outside the presence of the jury. Freemont objected on the basis that the testimony violated a discovery order previously entered in the case in July 2010. Freemont stated that he had not received a report regarding Bredow's testimony until a week prior to the start of trial.

Freemont argued that he did not know the purpose of Bredow's proffered testimony, that he was not allowed to review the expert's report, and that he was therefore not able to retain his own expert for rebuttal purposes. The State requested the court take judicial notice of the "notice to endorse" Bredow, which was delivered

to defense counsel on October 25, 2010. Defense counsel conceded that he had received the notice. The State also argued it had complied with the July 2010 discovery order by advising defense counsel of Bredow's forthcoming testimony in the form of a report sent January 3, 2011, by e-mail. The State asserted that the report was transmitted to defense counsel immediately after the State had received a copy. Neither the e-mail correspondence nor the report was offered into evidence. The trial court permitted Bredow to testify and offered defense counsel an opportunity to depose Bredow before proceeding with cross-examination, which counsel declined.

Only one witness testified on behalf of the defense. She was employed by the Omaha Police Department and assisted in the investigation of Galligo's death. She interviewed an eyewitness who testified for the prosecution. Freemont offered the videotaped interview between the defense witness and the eyewitness as exhibit 79. The court gave a limiting instruction to inform the jury that exhibit 79 was to be used for the sole purpose of impeaching the eyewitness' testimony at trial. In the video, the eyewitness identified the shooter as the driver of the white car and stated that the shooter wore a "do-rag" and had a thick mustache.

## 2. Jury Instructions

Following the presentation of evidence, an instruction conference was held. Freemont objected to the step instruction proposed by the court and requested that the court use the pattern jury instruction contained in NJI2d Crim. 3.1. The State objected to Freemont's proposed instruction. The court agreed with the State and ultimately gave the step instruction as jury instruction No. 4.[2]

---

[2] Jury instruction No. 4 includes two sections, each of which spells out the material elements for the two grades of homicide at issue here. Each section of the instruction then states that if the jury finds that the State has proved by evidence beyond a reasonable doubt that each and every one of the material elements set out in that section was true, the jury should find the defendant guilty of that crime. Each section goes on to state that if, on the other hand, it is found that the State had failed to prove beyond a reasonable doubt any one or more of the material elements in that

Freemont proposed an instruction regarding eyewitness identification based on a Connecticut pattern instruction. The State objected, noting that Nebraska has not created an eyewitness instruction and that it is not required in this jurisdiction. Freemont's proposed instruction states:

> [Y]ou should bear in mind that there has been a number of instances where responsible witnesses, whose honesty was not in question and whose opportunities for observation had been adequate, made positive identifications which identifications were subsequently proved to be erroneous; and accordingly you should be specially cautious before accepting such evidence of identification as correct. [*See United States v. Telfaire*, 469 F.2d 552 (D.C. Cir. 1972).]

The court denied Freemont's request to issue the instruction.

### 3. Convictions and Sentencing

The jury convicted Freemont on all three charges. At the sentencing hearing, the court noted that the jury apparently found Freemont guilty "fairly quickly," that there was no rational way to understand the incident, and that it bordered on "pure evil." The court sentenced Freemont to serve a term of 55 to 60 years' imprisonment on the murder count, 20 years' imprisonment for use of a deadly weapon, and 5 to 10 years' imprisonment for possession of a deadly weapon, to be served consecutively. The court awarded Freemont 264 days' credit against his sentences for time served.

---

section, it is the jury's duty to find the defendant not guilty of that crime. The instruction then directs the jury to "proceed to consider the lesser included offense." *Freemont*, 284 Neb. at 203, 817 N.W.2d at 297. (Filing No. 11-2 at CM/ECF p. 18; Filing No. 11-3 at CM/ECF pp. 37-39.) The instruction provides that the jury should find Freemont guilty of manslaughter if the State proved beyond a reasonable doubt that he killed Galligo without malice either upon a sudden quarrel or unintentionally while in the commission of an unlawful act. (Filing No. 11-3 at CM/ECF p. 38.) Instruction No. 10 defines "sudden quarrel." (*Id.* at CM/ECF p. 46.)

**B. Direct Appeal**

Freemont appealed his convictions to the Nebraska Supreme Court on March 23, 2011 and was represented by different counsel than at trial. (Filing No. 11-1.) Freemont argued that the state district court erred in (1) allowing the State to introduce evidence that Freemont possessed a firearm prior to the homicide, (2) allowing the State to introduce evidence of Freemont's "consciousness of guilt," (3) allowing the ballistics expert to testify after failing to comply with Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2010), (4) allowing the State to introduce evidence of autopsy photographs, (5) failing to give the jury an instruction regarding eyewitness identification and in giving a step instruction, and (6) finding sufficient evidence to support the verdicts. *Freemont*, 284 Neb. at 188-89, 817 N.W.2d at 288. (Filing No. 11-2 at CM/ECF p. 8.)

Freemont also asserted that his trial counsel was ineffective for failing to (1) elicit evidence of third-party guilt, (2) object to inadmissible identification evidence during a pretrial suppression hearing, (3) request a cautionary instruction regarding accomplice testimony, (4) request a mistrial when the State put forward a consciousness of guilt argument during closing arguments, (5) request a continuance in order to investigate fully Bredow's ballistics report, (6) adduce significant forensic evidence regarding bullet trajectory, and (7) elicit evidence regarding Freemont's lack of motive. *Freemont*, 284 Neb. at 205-08, 817 N.W.2d at 299-300. (Filing No. 11-2 at CM/ECF pp. 20-21.)

The Nebraska Supreme Court rejected Freemont's claims of trial court error and determined that the record was insufficient to review his claims of ineffective assistance of trial counsel. *Freemont*, 284 Neb. 179, 817 N.W.2d 277. (Filing No. 11-2.) Therefore, the court affirmed Freemont's convictions.[3] *Freemont*, 284 Neb.

---

[3] Although the court concluded that the trial court erred in allowing testimony that Freemont possessed a firearm prior to the homicide, the court found the error was harmless. *Freemont*, 284 Neb. at 190-95, 817 N.W.2d at 289-92. (Filing No. 11-2 at CM/ECF pp. 9-13.) As the court found only one error, and that error was

at 208, 817 N.W.2d at 300. (Filing No. 11-2 at CM/ECF p. 21.) The mandate issued on September 11, 2012.

## C. Postconviction Action

Freemont filed a verified motion for postconviction relief on April 8, 2013. (Filing No. 11-11 at CM/ECF pp. 2-15.) The state district court appointed new counsel to represent Freemont in the postconviction matter. (*Id.* at CM/ECF p. 30.) In July 2016, Freemont, through counsel, filed a verified amended postconviction motion. (*Id.* at CM/ECF pp. 30-37.) Freemont alleged numerous ineffective assistance of trial counsel claims, including the same seven ineffective assistance of trial counsel claims he raised on direct appeal and two additional claims that only related to ineffective assistance of trial counsel: (1) trial counsel failed to object to testimony by Martin regarding post-*Miranda* statements of Samantha Vawter that were not made available in pretrial discovery; and (2) trial counsel failed to make Freemont aware of his speedy trial rights. (*Id.*) Freemont also asserted that he was denied effective assistance of counsel because trial and appellate counsel failed to argue for a sudden quarrel jury instruction when all the evidence supported a manslaughter conviction. (*Id.*) He argued that failure to include a sudden quarrel jury instruction amounted to a violation of his right to Due Process under the Fourteenth Amendment. (*Id.*)

On December 8, 2016, the State filed a motion to dismiss the postconviction relief motion without an evidentiary hearing. (*Id.* at CM/ECF pp. 39-40.) In a written order entered December 11, 2017, the state district court denied postconviction relief on all grounds without an evidentiary hearing. (*Id.* at CM/ECF pp. 41-48.) With respect to the seven ineffective assistance of trial counsel claims that were also raised on direct appeal, the court addressed and rejected each claim on the merits. (*Id.* at CM/ECF pp. 44-48.) Regarding the two claims that only related to ineffective

harmless, the court determined there was no cumulative error effect warranting reversal. *Freemont*, 284 Neb. at 208, 817 N.W.2d at 300. (Filing No. 11-2 at CM/ECF p. 21.)

assistance of trial counsel and were not preserved on direct appeal, the court concluded those two arguments were procedurally barred because Freemont had separate trial and appellate counsel and those arguments were available at the time of the direct appeal. (*Id.* at CM/ECF p. 42 n.1 (citing *State v. Jackson,* 275 Neb. 434, 747 N.W.2d 418 (2008).) Last, the court rejected Freemont's claim that appellate counsel failed to raise on appeal that a sudden quarrel instruction was not presented to the jury, finding that the record refuted this claim as Instruction No. 4 specifically provided a sudden quarrel instruction[4] and appellate counsel assigned as error the step instruction provided in this case and that argument was rejected by the Nebraska Supreme Court. (*Id.* at CM/ECF p. 48.)

Freemont appealed the denial of postconviction relief to Nebraska's appellate courts. (Filing No. 11-10.) On February 23, 2018, the Nebraska Court of Appeals dismissed the appeal for lack of jurisdiction pursuant to Neb. Ct. R. App. P. § 2-107(A)(2) due to Freemont's failure to timely file his poverty affidavit pursuant to Neb. Rev. Stat. § 25-1912(1). (Filing No. 11-10 at CM/ECF p. 2.) The mandate issued on March 28, 2018. (Filing No. 11-12.)

## D. Habeas Petition

Freemont timely filed his Petition in this court on May 7, 2018. (Filing No. 1.) In response to the Petition, Respondent filed an Answer (filing no. 14), a Brief (filing no. 15), and the relevant state court records (filing no. 11). Respondent argues that Claim One is procedurally defaulted and Claim Two and Claim Three, while also procedurally defaulted, are without merit. Freemont filed a brief (filing no. 21) in response to Respondent's Answer. Respondent notified the court that he would not file a reply brief. (Filing No. 22.) This matter is fully submitted for disposition.

---

[4] Although the state district court did not mention trial counsel in its discussion of this claim, it is evident that the same reasoning would apply—namely, that the record refuted this claim as Instruction No. 4 specifically provided a sudden quarrel instruction.

# III. STANDARDS OF REVIEW

## A. Exhaustion and Procedural Default

As set forth in 28 U.S.C. § 2254:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

> (A) the applicant has exhausted the remedies available in the courts of the State; or

> (B)(i) there is an absence of available State corrective process; or

> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The United States Supreme Court has explained the habeas exhaustion requirement as follows:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

A state prisoner must therefore present the substance of each federal constitutional claim to the state courts before seeking federal habeas corpus relief. In Nebraska, "one complete round" ordinarily means that each § 2254 claim must

have been presented in an appeal to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Court of Appeals rules against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454-55 (8th Cir. 2005).

"In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts." *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (internal citation and quotation omitted). Although the language need not be identical, "[p]resenting a claim that is merely similar to the federal habeas claim is not sufficient to satisfy the fairly presented requirement." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999). In contrast, "[a] claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Wemark v. Iowa*, 322 F.3d 1018, 1021 (8th Cir. 2003) (citation omitted).

Where "no state court remedy is available for the unexhausted claim—that is, if resort to the state courts would be futile—then the exhaustion requirement in § 2254(b) is satisfied, but the failure to exhaust 'provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default.'" *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005) (quoting *Gray v. Netherland*, 518 U.S. 152, 162 (1996)). Stated another way, if a claim has not been presented to the Nebraska appellate courts and is now barred from presentation, the claim is procedurally defaulted, not unexhausted. *Akins*, 410 F.3d at 456 n.1.

To be precise, a federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Also, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). To invoke the actual innocence exception, a petitioner "must show that in light of all the evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Jennings v. United States*, 696 F.3d 759, 764-65 (8th Cir. 2012) (quoting *Schlup v. Delo*, 513 U.S. 298, 327, (1995)). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)).

## B. Nebraska Law Relevant to Procedural Default

Under Nebraska law, you don't get two bites of the postconviction apple; that is, "[a]n appellate court will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion." *State v. Ortiz*, 266 Neb. 959, 963, 670 N.W.2d 788, 792 (2003). Additionally, "[a] motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *Hall v. State*, 264 Neb. 151, 646 N.W.2d 572, 579 (Neb. 2002). *See also State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 880, 887 (Neb. 2015) ("A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased."); *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571, 576 (Neb. 2014) ("*When a defendant's trial counsel is different from his or her counsel on direct appeal*, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred.") (emphasis added).

Moreover, a person seeking postconviction relief must present his or her claim to the district court or the Nebraska appellate courts will not consider the claim on appeal. *State v. Deckard*, 272 Neb. 410, 722 N.W.2d 55, 63 (Neb. 2006) (denying postconviction relief in a murder case and stating: "An appellate court will not consider as an assignment of error a question not presented to the district court for disposition through a defendant's motion for postconviction relief.").

## IV. DISCUSSION

### A. Claim One

In Claim One, Freemont alleges that his trial counsel was ineffective for: (1) failing to elicit evidence and testimony from witnesses to support theory that a third party fired the shots; (2) failing to object to inadmissible identification evidence; (3) failing to request cautionary jury instruction regarding accomplice testimony; (4) failing to object to and ask for mistrial based on State's closing argument regarding Freemont's "consciousness of guilt"; (5) failing to request continuance or create a deposition outside the presence of the jury when the State provided an untimely ballistics report; (6) failing to adduce significant forensic evidence regarding bullet trajectory; (7) failing to elicit evidence on Freemont's lack of motive; (8) failing to object to testimony by Martin regarding post-*Miranda* statements of Samantha Vawter that were not made available in pretrial discovery; and (9) failing to make Freemont aware of his speedy trial rights.

Although Freemont presented his ineffective assistance of trial counsel claims to the Douglas County District Court in his amended postconviction motion, he failed to "fairly present" these claims to Nebraska's appellate courts. Indeed, on February 23, 2018, Freemont's postconviction appeal was dismissed because the poverty affidavit, filed in lieu of the statutory docket fee, was not timely filed pursuant to Neb. Rev. Stat. § 25-1912(1). *See* Neb. Ct. R. App. P. § 2-107(A)(2). (Filing No. 11-10 at CM/ECF p. 2.) Under Nebraska law, in order to vest the appellate courts with jurisdiction, a poverty affidavit must be filed within the time

that the docket fee otherwise must be deposited. *State v. Ruffin*, 280 Neb. 611, 618, 789 N.W.2d 19, 24-25 (2011). Because Freemont did not raise his ineffective assistance of trial counsel claims in one complete round in the Nebraska state courts as required by 28 U.S.C. § 2254(b)(1), and because Freemont cannot now raise his claims in a successive motion for postconviction relief, *see Ortiz*, 266 Neb. at 963, 670 N.W.2d at 792, his ineffective assistance of trial counsel claims are procedurally defaulted.

Freemont alleges in the habeas petition and in his brief that the dismissal of his state postconviction appeal was due to his postconviction counsel's failure to timely file the poverty affidavit or to pay the appellate filing fee. (Filing No. 1 at CM/ECF pp. 4, 15; Filing No. 21 at CM/ECF pp. 2-3.) To the extent Freemont argues that *Martinez v. Ryan*, 566 U.S. 1 (2012), applies to excuse the default of Claim One, his argument lacks merit.

In *Martinez*, the Supreme Court held that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17. The Supreme Court elaborated on and expanded this cause exception in *Trevino v. Thaler*, 569 U.S. 413 (2013). There, the Supreme Court held that *Martinez* is applicable not only in circumstances where a state requires a defendant to raise a claim of ineffective assistance of trial counsel in a state collateral proceeding, but also when a state maintains a procedural regime that amounts to such a requirement (i.e., when it is "virtually impossible" for an ineffective assistance claim to be raised on direct review). *Trevino*, 569 U.S. at 417.

Assuming, without deciding, that *Martinez* applies to federal habeas corpus cases arising from Nebraska convictions,[5] the holding in *Martinez* does nothing to excuse the procedural default of Freemont's ineffective assistance of trial counsel claims. In *Martinez*, the Court reasoned that a federal habeas court should "hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default *in an initial-review collateral proceeding* . . . ." *Martinez*, 566 U.S. at 14 (emphasis added). Here, the default of Freemont's ineffective assistance of trial counsel claims did not occur because he failed to raise them in the initial-review collateral proceeding (i.e., in his amended postconviction motion). Rather, the default occurred because, after raising them in his amended postconviction motion, he failed to perfect an appeal (filing no. 11-10 at CM/ECF p. 2). *See Williams v. Kenney*, No. 4:13CV3170, 2014 WL 5107145, at *6 (D. Neb. Oct. 10, 2014); *see also Mumin v. Frakes*, No. 4:16CV3033, 2017 WL 1131888, at *10 (D. Neb. Mar. 24, 2017) (the default of the petitioner's "ineffective assistance of trial counsel claims occurred, not on initial review (i.e. in his postconviction motion), but when he failed to properly raise them in his postconviction appeal to the state appellate courts"), *motion for relief from judgment denied*, No. 4:16CV3033, 2018 WL 6067511 (D. Neb. Nov. 20, 2018). In *Martinez*, the Court was concerned that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." 566 U.S. at 10. That concern is not present here because the issues were actually raised in the initial-review collateral proceeding (i.e., in his amended postconviction motion), and then considered and rejected by the Douglas County District Court. *See Mason*, 2019 WL 692943, at *3 n.2; *Williams*, 2014 WL 5107145, at *6. Indeed, the court's decision here is consistent with Eighth Circuit precedent. *See Arnold v. Dormire*, 675 F.3d 1082, 1086-88 (8th Cir. 2012) (concluding *Martinez* does not apply where ineffective assistance of trial counsel claims were litigated in an initial-

---

[5] The court does not believe that *Martinez* or *Trevino* applies in Nebraska. *See Mason v. Boyd*, No. 4:18CV3139, 2019 WL 692943, at *3 n.2 (D. Neb. Feb. 19, 2019). This is because Nebraska allows, and indeed demands, that ineffective assistance of trial counsel claims be raised on direct appeal when appellate counsel is different than trial counsel. *Filholm*, 287 Neb. at 767, 848 N.W.2d at 576.

review collateral proceeding, but not preserved on appeal; "The Court made clear that the holding in *Martinez* did not 'concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings . . . .'") (citing and quoting *Martinez*, 1 U.S. at 16). Accordingly, Freemont has failed to show cause and prejudice to excuse the procedural default of Claim One.

**B. Claims Two and Three**

In Claim Two, Freemont claims that he was denied effective assistance of counsel because trial and appellate counsel failed to argue for a sudden quarrel jury instruction when all the evidence supported a manslaughter conviction. In Claim Three, Freemont asserts that the failure to include a sudden quarrel jury instruction amounts to a violation of his right to Due Process under the Fourteenth Amendment. As with Claim One, Freemont presented these claims to the Douglas County District Court in his amended postconviction motion, but he failed to "fairly present" them to Nebraska's appellate courts because he did not perfect his appeal. For the reasons discussed above, *Martinez* does not apply to the ineffective assistance of trial counsel subclaim of Claim Two. In addition, *Martinez* does not apply to claims of ineffective assistance of appellate counsel or claims of trial error. *See Dansby v. Hobbs*, 766 F.3d 809, 833-34 (8th Cir. 2014); *see also Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (declining "to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state postconviction counsel provides ineffective assistance by failing to raise that claim"). Accordingly, Freemont has failed to show cause and prejudice to excuse the procedural default of Claim Two and Claim Three.[6]

---

[6] The court acknowledges that, at the time of Freemont's trial, manslaughter was considered an unintentional crime. *See State v. Jones*, 245 Neb. 821, 515 N.W.2d 654, 659 (1994). *Jones* remained the state of the law with regard to manslaughter until November 2011, when the Nebraska Supreme Court overruled *Jones* and held that the offense of manslaughter was an intentional killing without malice, upon a sudden quarrel. *State v. Ronald Smith*, 282 Neb. 720, 806 N.W.2d

# V.  CERTIFICATE OF APPEALABILITY

A petitioner cannot appeal an adverse ruling on his petition for writ of habeas corpus under § 2254 unless he is granted a certificate of appealability. 28 U.S.C. § 2253(c)(1); 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b)(1). The standards for certificates (1) where the district court reaches the merits or (2) where the district court rules on procedural grounds are set forth in *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). The court has applied the appropriate standard and determined that Petitioner is not entitled to a certificate of appealability.

IT IS THERFORE ORDERED that the habeas corpus petition (filing no. 1) is denied and dismissed with prejudice. No certificate of appealability has been or will be issued. Judgment will be issued by separate document.

_____

383, 394 (2011) ("*Ronald Smith*"). This change in the law occurred while Freemont's direct appeal was pending but before the decision was issued. After the mandate issued in Freemont's direct appeal, the Nebraska Supreme Court clarified its holding in *Ronald Smith*, stating:

> where there is evidence that (1) a killing occurred intentionally without premeditation and (2) the defendant was acting under the provocation of a sudden quarrel, a jury must be given the option of convicting of either second degree murder or voluntary manslaughter depending upon its resolution of the fact issue regarding provocation.

*State v. William Smith*, 284 Neb. 636, 656, 822 N.W.2d 401, 417 (2012) ("*William Smith*").

Claim Two and Claim Three appear to be based, at least in part, on *Ronald Smith* and/or *William Smith*. As previously discussed, however, Claim Two and Claim Three are procedurally defaulted based on Freemont's failure to perfect his postconviction appeal, and *Martinez* does not apply to excuse the procedural default. Even assuming *Martinez* applies to excuse the procedural default of the claim related to trial counsel's failure to challenge the manslaughter-sudden quarrel jury instruction pursuant to *Ronald Smith* and/or *William Smith*, the court notes that a trial counsel's failure to anticipate a change in existing law does not constitute deficient performance. *See Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996).

Dated this 24th day of April, 2019.

                                 BY THE COURT:

                                 s/ *Richard G. Kopf*
                                 Senior United States District Judge